In re WORLD TRADE CENTER
DISASTER SITE
LITIGATION.

No. 21 MC 100(AKH).

United States District Court,
S.D. New York.

Signed Aug. 5, 2015.

Robin Michel Wertheimer, Wertheimer Associates, P.C., Andrew John Carboy, Sr., Sullivan, Papain, Block, McGrath & Cannavo, P.C., David L. Kremen, Oshman & Mirisola, LLP, Suzanne Melissa Scott, A. Joseph Giannini, Mariangela Chiaravalloti, Friedman, Friedman, Chiaravalloti & Giannini, Donna Rae Silverglad, Sacks & Sacks, LLP, Andrew John Schotz, Flemming, Zulack, & Williamson, L.L.P., Brian David Crosby, Denise Ava Rubin, Napoli Bern Ripka & Associates, George N. Kalamaras, Michael C. Mace, Patricia I. Jorge, Christopher R. Lopalo, Harvey B. Ginsberg, W. Steven Berman, William Joseph Dubanevich, Worby, Groner, Edelman & Napoli Bern, L.L.P., New York, NY, Willard R. Pratt, III, Vernon, NY, Ryan Seth Goldstein, Law Office of Ryan S. Goldstein, PLLC, Bronx, NY, for Plaintiffs.

Francis Lavery, New York, NY, pro se.

Kathryn Lavery, New York, NY, pro se.

Arlene McGillick, New York, NY, pro se.

Jon J. McGillick, New York, NY, pro se.

Dewardranth Samaroo, New York, NY, pro se.

Andrew Lavoott Bluestone, Andrew Lavoott Bluestone, Esq., Blair Courtney Fensterstock, Michael Theodore Phillips, II, Fensterstock & Partners LLP, New York City, NY, for Lead Plaintiffs.

Marion S. Mishkin, New York, NY, pro se.

## ORDER APPROVING BONUS PAYMENT SETTLEMENT

ALVIN K. HELLERSTEIN, United States District Judge.

This Order concerns the final "bonus payment" owed by the World Trade Cen-

ter Captive Insurance Company ("Captive") to plaintiffs pursuant to .the 2011 Settlement Process Agreement ("SPA"). The Court of Appeals remanded this issue to me, as an issue of contract interpretation. 754 F.3d 114, 121–24 (2d Cir.2014). After intensive negotiations, and on the eve of a trial of the issues, the parties agreed to a settlement. On July 15, 2015, counsel for the parties submitted their settlement for the Court's approval. I find that the agreed amount is fair and reasonable and I approve the settlement.

## BACKGROUND

In the aftermath of the September 11, 2011 attacks on the World Trade Center, approximately 11,000 individuals filed suit in this Court for injuries they received during their clean-up work. By statute, this Court has exclusive jurisdiction over all such suits. *See* Air Transport Safety and System Stabilization Act ("ATSSSA") § 408(b)(3), Pub.L. No. 107–42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101 note). In February 2003, Congress allocated $1 billion to the Federal Emergency Management Agency ("FEMA") to establish, along with New York City, a captive insurance company, WTC Captive Insurance Co., to insure the City and its contractors against claims arising from World Trade Center debris removal. Consolidated Appropriations Resolution, 2003, Pub.L. No. 108–7, 117 Stat. 517–18 (2003).

After extensive pre-trial proceedings and prior to the scheduled trial, plaintiff's attorneys and the WTC Captive came to an agreement effective March 19, 2010. I rejected the settlement, . finding, after hearing, that the proposed settlement gave too much money to attorneys and not enough to those who were injured. The agreement also reserved too much money for unlikely future claims, and provided insufficient process to assure fairness to individual plaintiffs and accountability by counsel and the settlement administrators. *See* Tr. Status Conf. Mar. 19, 2010 at 54–64, *In re World Trade Ctr. Disaster Site Litig.,* 21 MC 100 (Doc. No. 2037) (S.D.N.Y. Mar. 19, 2010). The parties extended their negotiations and returned on June 10, 2010 with an amended Settlement Process Agreement ("SPA") which made the following changes:

- Raising the aggregate settlement amount by $50 million to a range between $625 million and $716 million.

- Reducing Plaintiff attorneys' contingent fees from 1/3 to 1/4 of net recoveries, adding another $50 million to net recoveries.

- Made provision for New York City, workman's compensation, and disability insurers to forgive liens on settlements, adding significant value to the settlements.

- Appointing a neutral settlement fund administrator and a neutral appeals officer, thus creating greater due process and accountability.

According to its terms, the SPA would become effective only if 95 percent of eligible plaintiffs opted-in to the settlement. If the approval rate exceeded 95 percent, bonus payments were to become payable to Tier IV plaintiffs (the category of the most seriously injured). If, in each of the five years after the effective date of the settlement, fewer than a fixed threshold of new cases were filed, another $25 million would become available to the Tier IV plaintiffs. On June 23, 2010, I ruled that the SPA was fair and reasonable. *See* Order, *In re World Trade Ctr. Disaster Site Litig.,* 21 MC 100 (Doc. No.2091) (S.D.N.Y. June 23, 2010).

## THE BONUS PROVISIONS
## OF THE SPA

Section VI.E of the SPA provides

> if during the Opt–In Period or any extension thereof by the WTC Captive, actual opt-in experience ... exceeds ninety-five percent (95%), the WTC Captive shall pay two percent (2%) of the Settlement Amount set forth in Section II.A of this Agreement for every one percent (1%) in excess of the ninety-five (95%) requirement; provided, however, that if actual opt-in experience ... exceeds ninety-eight percent (98%), the WTC Captive shall pay one fifth of one percent (0.20%) of the Settlement Amount set forth in Section II.A of this Agreement for every tenth of one percent (0.10%) above the ninety-five percent (95%) requirement.

*In re World Trade Ctr. Disaster Litig.*, 834 F.Supp.2d 184, 190 (S.D.N.Y.2011). The SPA calculated the opt-in percentage as the number of eligible plaintiffs who opted-in to the SPA divided by the total number of eligible plaintiffs. *Id.* Section VI.A provided:

> Only Plaintiffs with Debris Removal Claims filed against the insureds ... on or before April 12, 2010, or who have instituted Debris Removal Claims against the Insureds ... through other legal process recognized by New York law ... on or before April 12, 2010 shall be eligible for inclusion on the Eligible Plaintiff List.

It also provided:

> Plaintiffs who dismiss all of their Debris Removal Claims against the Insureds with prejudice by filing the Stipulation of Dismissal with Prejudice ... at any time before the Final Settlement Agreement Effective Date shall not be counted for purposes of determining compliance with the Opt-in Threshold. SPA § VIA.

## PROCEDURAL HISTORY

On the eve of the extended settlement effective date,[1] which was also the deadline for opting-in, I received a flurry of 185 purported dismissals with prejudice executed between defendants and plaintiffs' counsel, and was told that more were coming. I was told that the dismissals were necessary to satisfy the 95 percent threshold. To understand why so many plaintiffs were suddenly dismissing their lawsuits at the eve of payout and soon after the plaintiffs had answered a large set of interrogatories, I ordered a hearing so that counsel might explain the pattern. I learned at the hearing that the authorizations to dismiss were mostly not in writing, but rather had been "inferred" from the absence of communication with counsel. I appointed Michael Hoenig of Herzfeld & Rubin P.C. as Special Counsel to contact the 546 total non-responsive plaintiffs and attempt to determine their desired course of action, with the warning that plaintiffs who failed or refused to communicate with him would be dismissed. *See* Order Appointing Special Counsel, *In re World Trade Ctr. Disaster Site Litig.*, 21 MC 100 (Doc. No. 2257) (S.D.N.Y. Nov. 24, 2010). Of the 546 non-responsive plaintiffs, 44 agreed to settle, 31 chose to continue their lawsuits, and 47 chose to dismiss their cases. However, 421 plaintiffs failed to respond at all, and I dismissed their cases with prejudice pursuant to Fed.R.Civ.P. 41(b).

In calculating the bonus payment, I did not count any of the dismissed plaintiffs among the total eligible plaintiffs: not those who had voluntarily dismissed, or the 421 who were involuntarily dismissed

---

1. The effective date was originally set at September 10, 2010, but was extended twice, to November 8 and subsequently November 16, 2010.

for failing or refusing to communicate with the special counsel or otherwise prosecute their cases. This resulted, according to the statistics then in hand, in an extraordinary 99.4 percent of total eligible plaintiffs opting-in to the settlement. In the bonus payment schedule, a 99.4% opt-in rate corresponded to a $55 million bonus payment, which brought the total value of the SPA to $680 million. I ruled that the most reasonable interpretation of the SPA was that "[a] [p]laintiff who had taken himself out of eligibility, either because he had eliminated himself from eligibility by dismissing his claim, or because he had chosen to be indifferent to the entire process and [allowed] the court to dismiss his claim, should not [ ] be counted as a [p]laintiff." *In re World Trade Ctr. Disaster Site Litig.*, 834 F.Supp.2d 184, 194 (S.D.N.Y.2011). I explained that "the intention and purpose of the WTC Captive was to eliminate the exposure of the City and its contractors to 9/11 litigation," and that the dismissals achieved the Captive's purpose, regardless of the method. *Id.* This was especially true because, given the rigorous methods the Court utilized to pursue each plaintiff, there was little chance of involuntarily-dismissed plaintiffs successfully reinstating claims on grounds of "mistake, inadvertence, . . . or excusable neglect." *Id.* (quoting Fed.R.Civ.P. 60(b)-(c)).

Defendants appealed, and the Court of Appeals reversed my interpretation of the bonus payment clause. *See In re World Trade Ctr. Disaster Site Litig.*, 754 F.3d 114, 121–24 (2d Cir.2014). The Second Circuit found that the SPA "was missing a term, as the agreement did not address whether plaintiffs whose claims were invol-

untarily dismissed should be included in the EPL." *Id.* Therefore, it found the SPA to be ambiguous, as "reasonable minds could disagree as to whether the phrase '[p]laintiffs who dismiss' includes '[p]laintiffs who are dismissed.'" *Id.* It vacated and remanded for the Court to determine the parties' intent through extrinsic evidence.

Following the remand, the parties conducted settlement negotiations over an extended period of time. In June 2015, they informed the Court that negotiations had reached an impasse. I set discovery and briefing schedules to resolve the contractual ambiguity, and ordered the appointment of Special Counsel in light of a potential conflict for Paul Napoli, lead plaintiffs' lawyer and SPA negotiator. *See* Order, *In re World Trade Ctr. Disaster Site Litig.*, 21 MC 100 (Doc. No. 3231) (S.D.N.Y. June 8, 2015). Apparently, the order dissolved the impasse, because in late June 2015, Mr. Napoli and Mr. Papain for the plaintiffs and Ms. Warren and Mr. Biester for the WTC Captive informed the Court that they had settled on a total bonus payment of $30 million. This figure includes the $12.5 million bonus payment from March 2011, an additional $17.5 million to settle the bonus payment dispute, and several material corrections to the statistical underpinnings of the dispute. I now consider the fairness of that settlement.

### THE SETTLEMENT

This settlement brings the total recovery for plaintiffs who opted-in to the SPA above $700 million.[2] The additional $17.5

---

**2.** This amount includes: (1) the base $625 million settlement amount, including the premium for the Cancer Insurance Policy, per Section II.B of the SPA; (2) $13.8 million of Contingent Payments to date per Section IV of the SPA; (3) $5 million for the Fifth Con-

tingent Payment in January 2016, per Section IV of the SPA; (4) $27.5 million for London Marine Insurers' payment amounts per Section II.F of the SPA; (5) $12.5 million of bonus payments from March 2011, per Section VI.E of the SPA; and (6) $17.5 million

million bonus payment will be apportioned among Tier 4 Plaintiffs and Permanent Disability Fund Awardees, the category of plaintiffs who were the most severely injured by the World Trade Center pollutants. The settlement contemplates that eligible plaintiffs will receive additional average recoveries of $3,000, with the most severely injured plaintiffs receiving up to $48,000.

■ In evaluating the fairness of a settlement, a district court should consider:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974); *see also McReynolds v. Richards–Cantave*, 588 F.3d 790, 804 (2d Cir.2009).

■ In this case, the factors weigh in favor of approving the settlement. First, the litigation, if not settled, will continue through an appeals process that is likely to challenge more issues than just the bonus provision, including the basic issue of a district judge's power and responsibilities in aggregate litigation. The issue, if addressed by the Supreme Court, could add years of uncertainty. In contrast, a settlement will enable plaintiffs to realize the benefits of the settlement proceeds now, not later. The proposed settlement reflects a satisfactory disposition of disputed issues.

The dispute as to the correct interpretation of "eligible plaintiffs" under the SPA is a genuine issue and, as the Court of Appeals explained, each party potentially has strong arguments supporting its favored interpretation. After adjusting the statistics regarding the true number of plaintiffs remaining in the case, Plaintiff's proposed interpretation of "eligible plaintiffs" yields an opt-in rate as high as 98.7 percent, which corresponding to $33.75 million in additional bonus payments. In contrast, the WTC Captive argues that no further bonus payment is due and, if due, it could not exceed $27.5 million. The settlement figure of $17.5 million is more than half the most optimistic figure, and as much as 64% of the WTC Captive's figure. The settlement appears to reflect a fair valuation of the parties' chances of success, given the complexity of the case, the years of potential litigation that still could remain, and the underlying risks.

A laborious evaluation of the other criteria is unnecessary. I am satisfied that the settlement provides significant and immediate relief for the sickest plaintiffs, in amounts that reflect the uncertainty of this long-running dispute. The settlement is approved.

## ATTORNEYS' FEES

■ Attorneys for plaintiffs seek combined fees of $1.6 million, inclusive of all of plaintiffs' expenses for this matter, pursuant to the formula set out in my Order of

for settlement of the instant bonus payment dispute on remand, per Section VI.E of the SPA.

January 16; 2015.[3] *See In re World Trade Ctr. Disaster Site Litig.*, 83 F.Supp.3d 519, 525 (S.D.N.Y.2015). The fee, which represents approximately 9.1 percent of the most final bonus payment figure, provides fair compensation for attorneys who have expended significant time and resources on the matter. *See generally City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977). I find that the requested fee is. reasonable.

## CONCLUSION

For the foregoing reasons, the proposed settlement as to the amount of the final bonus payment under the SPA is approved. The parties shall promptly agree to an appropriate order and instructions to the Allocation Neutral to provide for prompt distribution to all plaintiffs eligible to receive the bonus payments.

SO ORDERED.

---

**3.** The formula provides for a $100,000 flat fee for recovery up to $7.5 million; plus 10% of any recovery between $7.5 million and $12.5 million; plus 15% of any recovery between $12.5 million and $15 million; plus 25% of any recovery between $15 million and $20 million; plus 33 1/3% of any recovery above $20 million.